**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Bankruptcy No. 07-11757 (KCF) |
| SOLOMON DWEK, | : | Adv. Proc. Nos. 07-1616 (KCF) |
| | : | 07-1697 (KCF) |
| | : | |
| Debtor. | : | |
| | : | |
| JOSEPH DWEK, et al., | : | |
| | : | CIVIL ACTION NO. 10-3770 (MLC) |
| Appellants, | : | |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| SUN NATIONAL BANK, et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

**COOPER, District Judge**

Appellants Joseph Dwek ("Joseph") and Terry Dwek ("Terry" and together with Joseph, the "Dweks") filed a complaint against appellees Sun National Bank ("Sun") and Solomon Dwek ("Solomon") in September 2006 in the Superior Court of New Jersey, Chancery Division, challenging the validity of a 2001 loan transaction (the "Loan") involving a promissory note (the "Note") in the original principal amount of $1,500,000 secured by a mortgage (the "Mortgage") on their property at 234 Runyan Avenue, Deal, New Jersey (the "Property"), in favor of Sun.  Sun removed the action to the United States District Court for the District of New Jersey, and the District Court referred the action to the United States Bankruptcy Court for the District of New Jersey

("Bankruptcy Court").  Civil Action No. 07-1975 (FLW) (filed
April 26, 2007); Bankr. No. 07-11757 (KCF), dkt. entry no. 329,
4-27-07 Order of Referral; Adv. Proc. No. 07-1616 (KCF), <u>Dwek et
al. v. Sun Nat'l Bank</u>.  Sun then commenced a separate adversary
proceeding against Solomon seeking a determination that to the
extent Solomon, the debtor in a Chapter 7 bankruptcy proceeding
that was later converted to Chapter 11, might be found liable for
any damages to Sun in the removed action, that obligation would
be deemed non-dischargeable in Solomon's bankruptcy proceeding.
Adv. Proc. No. 07-1697 (KCF), <u>Sun Nat'l Bank v. Solomon Dwek</u>,
dkt. entry no. 1, Compl.  The Bankruptcy Court consolidated the
two adversary proceedings, pursuant to Federal Rule of Bankruptcy
Procedure 7042.  Bankr. No. 07-11757, dkt. entry no. 1006, 10-11-
07 Order at 4.

The Bankruptcy Court tried the consolidated adversary
proceedings on October 27, 2009, December 15, 2009, and January
26, 2010.  <u>See</u> Adv. Proc. No. 07-1616, dkt. entry no. 55, 10-27-
09 Trial Tr.; dkt. entry no. 57, 12-15-09 Trial Tr.; dkt. entry
no. 63, 1-26-10 Trial Tr.  The Bankruptcy Court issued a written
opinion discussing its findings and conclusions on June 1, 2010.
(Dkt. entry no. 1, 6-1-10 Mem. Op.)  In an Order of Final
Judgment dated June 10, 2010, the Bankruptcy Court entered
judgment in favor of Sun and against the Dweks as to Sun's
counterclaims for breach of contract, and a judgment declaring

2

the Dweks liable to Sun in the amount of $1,845,850.85 on the
Loan, Note, and Mortgage.  (Dkt. entry no. 1, 6-10-10 Order of
Final J.)  The Bankruptcy Court dismissed as moot Sun's remaining
counterclaims, along with Sun's crossclaim, third-party
complaint, and claim against Solomon seeking a claim of non-
dischargeability in the bankruptcy proceeding.  (Id.)  The
Bankruptcy Court dismissed the Dweks' complaint with prejudice in
its entirety.  (Id.)

The Dweks now appeal from the 6-10-10 Order of Final
Judgment, pursuant to 28 U.S.C. § 158(a).  (Dkt. entry no. 1,
Not. of Appeal.)  For the reasons stated herein, the Court will
affirm the 6-10-10 Order of Final Judgment.

## BACKGROUND

The Dweks, husband and wife, jointly own the Property.
(Dkt. entry no. 5, Dweks' Br. at 5.)  Solomon is their nephew.
(Id.)  Solomon and Joseph engaged in numerous real estate
transactions together from 2000 until April 2006, when it became
publicly known that Solomon had defrauded investors, including
the Dweks, of millions of dollars.  (Id. at 5-6.)

Sun is the successor in interest to the mortgagee of the
Property, Community Bank of New Jersey (interchangeably with Sun,
the "Bank").  (Id. at 4.)  The Note and Mortgage at issue in this
case were entered into on December 13, 2001, and the Mortgage was
recorded on December 21, 2001.  (6-1-10 Mem. Op. at 3-4; Dweks'

3

Br. at 4.)  The Dweks alleged that Solomon "forged the signatures of Joseph and Terry on the Note, Mortgage, and related loan documents in [the Bank's] favor in connection with the alleged 2001 Loan."  Civil Action No. 07-1975 (FLW), dkt. entry no. 1, Rmv. Not., Ex. A, Compl. at ¶ 8.  (See 6-1-10 Mem. Op. at 4.) The signatures on the Mortgage were notarized by Solomon's secretary.  (Id.)

It is uncontested that Terry never signed the Note, Mortgage, or any associated loan documents, and the Bankruptcy Court determined that she had never authorized Solomon to do so on her behalf.  (Id. at 5-6.)  In contrast, the Bankruptcy Court found that Joseph himself had signed the Mortgage.  (Id. at 4-7.) The Bankruptcy Court further found that Joseph had authorized Solomon to sign the remainder of the loan documents on his behalf, reasoning that "it would be nonsensical for Joseph to agree to mortgage his property (a form of security) but not agree to the underlying loan."  (Id. at 7.)

Joseph argued at trial and continues to contend that he did not know about the Loan and Mortgage until March 2005, when he discovered the existence of the Loan on his personal credit report.  (Dweks' Br. at 13.)  Joseph called the Bank to inquire about the Loan, and spoke to an employee named Cheryl Hale ("Hale"), who advised that the Loan was associated with the Mortgage on the Property.  (Id.)  Joseph requested documentation of the Loan, and the Bank sent him a copy of the Mortgage, as

4

well as documentation relating to the servicing of the Loan, in
March and April of 2005.  (Id.)  Joseph contends that he
"repudiated the loan by stating 'it was not his'" during the
course of his initial conversation with Hale.  (Id.)  The
Bankruptcy Court discredited this representation, finding that
the Dweks did not repudiate the Loan until over a year later,
when their attorney sent a letter to Sun, dated June 9, 2006.
(6-1-10 Mem. Op. at 9.)  The Bankruptcy Court found Hale's
testimony that Joseph did not repudiate the Loan during their
March 2005 conversation "far more credible" than Joseph's
testimony that he clearly and unambiguously told Hale that the
Loan was not his.  (Id. at 10.)  The Bankruptcy Court observed
that the Dweks' attorney's letter to the Bank of June 9, 2006,
did not reference a prior attempt by the Dweks to repudiate the
Loan, and concluded that "[t]he absence of any reference to the
alleged repudiation in March 2005 is far more suggestive of the
actual state of affairs than Joseph Dwek's current attempt to
shape the facts."  (Id. at 11.)

Joseph continued to do business with Solomon even after
discovering the existence of the Note and Mortgage in March 2005,
giving Solomon $50 million to invest in real estate.  (Id.)  The
Bankruptcy Court found this conduct to be inconsistent with the
Dweks' claims that Joseph had repudiated the $1.5 million Loan
and that Solomon lacked authority to enter into the Loan

5

Agreement on their behalf; Joseph testified at trial that after he learned of the Loan in March 2005, he was satisfied to let Solomon "take care of it" by paying off the Loan and obtaining a discharge.  (Id. at 11-12.)[1]  The Bankruptcy Court concluded that Joseph ratified the Loan by failing to timely repudiate it after discovering its existence in March 2005, when he became apprised of all material facts––namely, that the Mortgage had been placed on the Property to secure a $1.5 million Loan.  (Id. at 13.)  The Bankruptcy Court imputed this ratification to Terry, based on evidence adduced at trial showing that "Terry allowed her husband to act as her agent in financial matters," including signing loan and mortgage documents on her behalf, such that Terry could not "single out this transaction and claim that it was unauthorized." (Id. at 14.)

The Dweks argue that the Bankruptcy Court erred in finding that Solomon was authorized to execute the Note and Loan Documents on Joseph's behalf, and contend that it should not have considered the equitable defense of ratification because the Bank has unclean hands insofar as it failed to comply with certain legal requirements pertaining to the authority of an agent to bind a principal in banking transactions.  (Dweks' Br. at 14, 20-22.)  They argue that the Bankruptcy Court erred in finding that

---

[1] Solomon ceased making payments on the Loan in May 2006. (6-1-10 Mem. Op. at 16.)

Joseph ratified the Loan, and imputing that ratification to Terry.  (Id. at 25.)  The Dweks also appeal from the Bankruptcy Court's ruling that they had failed to prove that the Bank was negligent in "fail[ing] to properly verify the identity of the 'borrowers'" and not demanding a written power of attorney showing that Solomon was authorized to act on behalf of the Dweks.  (Id. at 26.)  Finally, the Dweks contend that to the extent the Bankruptcy Court found that the Mortgage had been signed by Joseph, it failed to consider the Dweks' contention that the Mortgage is void because his signature was obtained by fraud in the factum.  (Id. at 30.)[2]

Sun contends that the Bankruptcy Court properly found that (1) Joseph signed the Mortgage and authorized Solomon to execute the remaining Loan documents on his behalf; (2) notwithstanding the foregoing findings, Joseph ratified the Loan by failing to timely repudiate it upon learning of its existence in March 2005; (3) the ratification could be properly extended to Terry; and (4) the Dweks failed to prove the Bank was negligent.  (Dkt. entry no. 6, Sun Br. at 15, 27, 43-44.)  Sun further argues that the Dweks' fraud in the factum defense is precluded by the Bankruptcy Court's findings that "Joseph Dwek not only signed the Mortgage,

_____

[2] The Dweks make no mention of their fraud in the factum defense in their Statement of Issues to be Presented on Appeal. (Dkt. entry no. 2, Dweks' Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented.)

but was in fact aware of the Loan and the Mortgage <u>at their</u> <u>inception</u>."  (<u>Id.</u> at 48.)

## DISCUSSION

### I.   Jurisdiction and Standard of Review

A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees.  28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's "legal determination de novo, its factual findings for clear error[,] and its exercise of discretion for an abuse thereof." <u>In re Rashid</u>, 210 F.3d 201, 205 (3d Cir. 2000); <u>see</u> Fed.R.Bankr.P. 8013 ("On appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.")  Also, the Court, when addressing mixed questions of law and fact, divides the questions into their respective components and applies the appropriate standard to each.  <u>In re Brown</u>, 951 F.2d 564, 567 (3d Cir. 1991).

### II.  Standard of Review Applied Here

#### A.   Whether Joseph Signed the Mortgage

The Dweks appeal the Bankruptcy Court's finding that "Joseph Dwek himself signed the mortgage." (6-1-10 Mem. Op. at 7.)  They contend that the signature on the Mortgage was placed there via a forgery or fraud. (Dweks' Br. at 11.)  The Dweks argue that the

8

signature is a forgery because (1) the signature contains letters
that are below or on top of the signature line, and Joseph
"always signs his name above the signature line"; (2) the
Mortgage does not have the Hebrew symbol meaning "with God's
help" on the first page of the document, but instead it appears
on the signature page, contrary to the "genuine samples relied
upon by the Bank's expert and . . . verified by Joseph to be
authentic"; and (3) Joseph did not execute any of the Loan
documents, including the Mortgage, in the presence of Solomon's
secretary in New Jersey, contrary to the notarization of the
Mortgage.  (Id. at 12.)

    We find no clear error in the Bankruptcy Court's
determination, based on the evidence presented at trial, that
Joseph's signature on the Mortgage was valid and not a forgery.
J. Wright Leonard ("Leonard"), an expert in document examination
and handwriting analysis, testified on behalf of the Bank at
trial.  1-26-10 Trial Tr. at 23:2-11, 26:19-25.  Leonard
testified that she had reviewed the original Mortgage document,
dated 12-13-01, and conclusively determined that "the questioned
signature . . . was executed by the same hand that executed the
genuine signatures" verified by Joseph as authentic.  1-26-10
Trial Tr. at 32:14-25, 33:20-23, 39:17-25.  Leonard further
testified that she had observed that the signature page of the
Mortgage had a Hebrew symbol in the top right corner, and many of

the documents known to be genuine contained the same symbol in the top right corner, although she was "unable to identify the hand that executed them."  1-26-10 Trial Tr. at 40:3-19.  She stated that the apparent inconsistency in the page placement of the Hebrew symbol did not factor at all in her analysis of whether Joseph's signature on the Mortgage was genuine.  1-26-10 Trial Tr. at 58:6-9.  She also testified that the fact that Joseph's signature on the Mortgage went below the signature line was not a "determining factor" in whether the signature was authentic "because a number of things could have caused that; the position of the writer or the position of the paper."  1-26-10 Trial Tr. at 45:8-15.  Leonard testified that "certainly," Solomon did not forge Joseph's signature on the Mortgage.  1-26-10 Trial Tr. at 42:4-13.

The Dweks offered no evidence to counter Leonard's expert opinion that the signature on the Mortgage was conclusively Joseph's, save for Joseph's vague testimony that it is "a mystery how [his] signature is on" the Mortgage.  10-27-09 Trial Tr. at 54:22-23.  Even without Solomon's testimony that Joseph signed the Mortgage in Joseph's New York office, there is sufficient evidence in the record for this Court to conclude that the Bankruptcy Court's factual finding that Joseph's signature on the Mortgage is genuine was not clearly erroneous.  12-15-09 Trial Tr. at 22:19-20, 24:1-18, 25:5-8.  (See 6-1-10 Mem. Op. at 6.)

**B.    Whether Solomon had Authority to Execute the Note and Loan Documents on Behalf of the Dweks**

The Dweks next contend that the Bankruptcy Court erred in finding that Solomon "was authorized to execute the remainder of the loan documents on Joseph's behalf." (6-1-10 Mem. Op. at 8.) The parties do not dispute that Solomon executed Loan documents, including a "Commitment Letter, Business Loan Agreement, Promissory Note, Agreement to Provide Insurance, Insurance and Compliance, and Affidavit of Title, by signing Joseph and Terry's names to each of the documents." (Dweks' Br. at 10.)  Solomon testified that the day after Joseph signed the Mortgage, an officer from the Bank brought the remaining Loan documents to Solomon, who signed the Dweks' names to the documents. See 12-15-09 Trial Tr. at 28:25-29:14.

Solomon testified that he was authorized to sign documents on behalf of both Joseph and Terry, and furthermore, that this was a usual practice in his business dealings with his uncle and aunt. 12-15-09 Trial Tr. at 29:15-21, 31:5-6.  With regard to the Loan, Solomon testified that when the Mortgage had been prepared but the remaining documents were not yet ready, he and a Bank officer called Joseph on speakerphone from Solomon's office, and the officer asked Joseph "if it was okay if [Solomon] just brought up the mortgage note then and other documents would be ready the next day." 12-15-09 Trial Tr. at 24:4-8.  Solomon testified that Joseph responded:  "That's fine, and Solomon could

11

sign all the other documents," just as Solomon had done for "numerous other loans" that Solomon took out on Joseph's behalf. 12-15-09 Trial Tr. at 24:8-10.  While Solomon made reference to a power of attorney document he believed an attorney who represented both Solomon and Joseph had prepared to allow Solomon to sign documents on Joseph's behalf, such document was not introduced into evidence at trial.  See 12-15-09 Trial Tr. at 26:23-25, 47:4-49:21.[3]

The Bankruptcy Court relied heavily on the evidence regarding the business relationship between Solomon and Joseph in determining that Joseph authorized Solomon to execute the remaining Loan documents.  (6-1-10 Mem. Op. at 7.)  The Bankruptcy Court observed:  "The picture that emerged from the trial testimony was that, despite the sizable amounts of money involved, Joseph was quite casual about the loan transactions he entered into with his nephew."  As Solomon testified, "I was [Joseph's] agent for buying all the buildings and managing over $100 million of his money."  12-15-09 Trial Tr. at 49:4-6.

---

[3] Solomon suggested at trial that he was unable to produce the power of attorney because it was in the physical possession of the Dweks, having been sent back to them at their request by the attorney's secretary in May 2006.  12-15-09 Trial Tr. at 48:23-49:17.  The attorney in question testified that he had never seen, and his files did not contain, a written power of attorney authorizing Solomon to act on behalf of either Terry or Joseph.  1-26-10 Trial Tr. at 102:15-23.

Joseph's testimony was generally consistent with Solomon's depiction of their casual arrangement, stating that Solomon "was supposed to go and find real estate properties and negotiate those terms," although he denied authorizing Solomon to sign bank documents on his behalf.  10-27-09 Trial Tr. at 62:2-9.  Joseph testified that "most of the time," he did not attend the closings for the purchase of properties Solomon negotiated on his behalf, supporting the inference that Solomon was authorized to act as Joseph's agent in these transactions.  10-27-09 Trial Tr. at 83:10-12.

Solomon's testimony that he was authorized to act on the Dweks' behalf in executing loan documents was supported by certain documents introduced at trial relating to the "Goodyear Windsor" loan.  (6-1-10 Mem. Op. at 7.)  The Goodyear Windsor loan for $816,000 was taken out approximately six months prior to the Loan, and while some loan documents had been signed by Joseph personally, a "Disbursement Request and Authorization" and a subsequent document setting forth a change in terms agreement were signed by Solomon on behalf of Joseph.  1-26-10 Trial Tr. at 16:19-17:25.  Joseph has at no point sought to repudiate on the basis of an unauthorized signature, notwithstanding the apparent absence of an express power of attorney.  (6-1-10 Mem. Op. at 7 & n.1.)  Therefore, the Goodyear Windsor loan tends to show that

Solomon was authorized to execute loan documents by signing Joseph's name to them when Joseph was unavailable to do so.

We find no error in the Bankruptcy Court's factual finding that Joseph authorized Solomon to execute the remaining Loan documents, as this finding is supported by the evidence in the record.  The Bankruptcy Court did not expressly make a legal conclusion that the Loan documents are valid and enforceable on the basis of Solomon's authorized execution of those documents, presumably because the Bankruptcy Court's finding that Joseph later ratified the Loan mooted the issue.  (See 6-1-10 Mem. Op. at 8.)  Insofar as Solomon testified that Joseph assented during a telephone call between Solomon, Joseph, and a Bank officer to have Solomon execute all Loan documents other than the Mortgage, such testimony supports a legal conclusion that Solomon was authorized to do so.  See N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co., 1 A.3d 632, 639 (N.J. 2010) ("An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'") (quoting Restatement 3d of Agency § 1.01 (2006)).  This is true even in the absence of a written power of attorney.  Amb Prop., LP v. Penn Am. Ins. Co., No. A-1248-0972, 2011 WL 487784, at *6 (N.J. App. Div. Feb. 14, 2011).

14

### C.    Whether Joseph Ratified the Mortgage

We note, as an initial matter, that the Dweks argued at trial that the Bankruptcy Court should not consider the equitable defense of ratification because of the Bank's alleged failure to comport with certain requirements for making banking transactions with an agent pursuant to a power of attorney.  (See Dweks' Br. at 20.)  The Bankruptcy Court correctly observed that "application of the doctrine of unclean hands 'is discretionary on the part of the court.'"  (6-1-10 Mem. Op. at 8 (quoting Borough of Princeton v. Bd. of Chosen Freeholders of Mercer Cnty., 777 A.2d 19, 32 (N.J. 2001)).)

We find no abuse of discretion on the part of the Bankruptcy Court insofar as it considered the Bank's ratification defense. The Dweks point to no authority for their position that "specific banking regulations . . . require an agent to present a banking institution with an executed power of attorney" in order for the agent to undertake "specific banking actions," nor for their conclusion that because "no power of attorney existed, nor was one presented, therefore the entire transaction must be deemed invalid."  (Dweks' Br. at 21-22 (citing N.J.S.A. §§ 46:2B-11 and -13).)  The plain language of the "Revised Durable Power of Attorney Act" does not support such a reading, and the Dweks have not cited any case interpreting the act as a "banking regulation" imposing "requirements" on a bank or an agent or somehow

15

preempting the law of agency.  N.J.S.A. § 46:2B-8.1.  The statutory provisions cited by the Dweks merely provide one standardized mechanism for banks to utilize executed powers of attorney.  See, e.g., 16A N.J. Practice § 52:1 ("N.J.S.A. 46:2B-10 et seq. provides a mechanism for principals and agents to enter into and exercise agreements providing powers of attorney for the purpose of conducting banking transactions.  The act does not give an agent any greater authority or rights than the principal could exercise on his own behalf. . . . This act is not the exclusive method of providing for powers of attorney for bank transactions.") (emphasis added); accord Stmt. of S. Labor, Indus., & Professions Comm., No. 2886, L.1991, c. 95 (commentary to N.J.S.A. § 46:2B-10); cf. N.J.S.A. § 12A:3-402(a) ("If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract.  If the represented person is bound, the signature of the representative is the 'authorized signature of the represented person' and the represented person is liable on the instrument, whether or not identified in the instrument.").

Having determined that the Bankruptcy Court did not abuse its discretion in entertaining the Bank's ratification argument,

16

we consider the Dweks' challenge to the Bankruptcy Court's
finding that Joseph ratified the Loan transaction.  (6-1-10 Mem.
Op. at 14.)  As the Bankruptcy Court observed, ratification is
"the affirmance by a person of a prior act which did not bind him
but which was done, or professedly done on his account, whereby
the act, as to some or all persons, is given effect as if
originally authorized by him," and requires (1) an intent to
ratify, and (2) full knowledge of all material facts.  (6-1-10
Mem. Op. at 9 (quoting Martin Glennon, Inc. v. First Fid. Bank,
N.A., 279 N.J. Super. 48, 60 (N.J. App. Div. 1995)).)  See also
Thermo Contracting Corp. v. Bank of N.J., 354 A.2d 291, 296 (N.J.
1976).  "[I]ntent may be inferred from the failure to repudiate
an unauthorized act, from inaction, or from conduct on the part
of the principal which is inconsistent with any other position
than intent to adopt the act."  Id. (internal citations omitted).

The Bankruptcy Court determined, as a factual matter, that
"the Dweks did not disown Solomon's act until their attorney sent
a letter to the Bank dated June 9, 2006."  (6-1-10 Mem. Op. at
9.)  In making this finding, the Bankruptcy Court credited Hale's
"absolutely clear and consistent" testimony that Joseph did not
repudiate the Loan when they spoke on the phone about the Loan in
March 2005.  (6-1-10 Mem. Op. at 10.)  Although Joseph testified
that after Hale sent him a copy of the Note and Mortgage in mid-
March, 2005, he called her back and "mentioned to Cheryl Hale

17

that [he] didn't think it was [his] loan," he also testified that
he "didn't have any follow-up conversation with the bank."  10-
27-09 Trial Tr. at 64:18-65:7, 68:1-4.  We find no clear error in
the Bankruptcy Court's determination that the testimony of Hale,
"who had nothing to hide because she had no involvement in the
initiation of the loan," was "far more credible" in her statement
that if Joseph had repudiated the Loan, she would have brought it
to the attention of Bank personnel at that time.  (6-1-10 Mem.
Op. at 10.)  This credibility determination was supported by the
facts that (1) the Dweks' attorney's letter to the Bank of June
9, 2006, repudiating the Loan, made no reference to Joseph's
alleged earlier repudiation, and (2) Joseph provided Solomon an
additional $50 million to invest in real estate after March 2005.
(Id. at 11 (citing 10-27-09 Trial Tr. at 98:10-14).)

    It is apparent from the record that Joseph was aware of all
material facts surrounding the Loan as of March 2005, when Hale
provided him with the Mortgage and Note.  10-27-09 Trial Tr. at
64:16-22.  He spoke to Solomon about the Loan shortly thereafter,
who told Joseph that he would have the Loan discharged.  10-27-09
Trial Tr. at 65:21-66:14.  Joseph testified that he believed
Solomon's representation that he would discharge the Loan because
"up until that time everything was smooth and fruity and . . .
doing great and so while [it] was a big shock to me that he could
take out a mortgage on my house and being he's my nephew and he

said he was going to discharge it, I trusted him."  10-27-09
Trial Tr. at 67:8-12.  Thus, by Joseph's own testimony, he was
aware of the allegedly unauthorized Loan as of March 2005, but
chose not to repudiate it to the Bank, instead opting to deal
directly with Solomon on the belief that Solomon would discharge
it.  See 10-27-09 Trial Tr. at 67:15-18 (stating that he did not
consider taking action against Solomon because Solomon "promised
he's going to take care of it").

Joseph's intent to ratify the Loan can be inferred from this
course of conduct.  See Johnson v. Hosp. Serv. Plan of N.J., 135
A.2d 483, 486 (N.J. 1957) ("The intent to ratify an unauthorized
transaction may be inferred from a failure to repudiate it.");
Citizens First Nat'l Bank of N.J. v. Bluh, 656 A.2d 853, 859
(N.J. App. Div. 1995) (noting well-settled rule that failure of
principal to inform third party that agent has exceeded his
authority must "disown his agent's act" without unreasonable
delay, or else "make his agent's act his own") (quoting Chetwood
v. Berrian, 39 N.J. Eq. 203, 209 (Ch. 1884)).  By waiting from
March 2005 to June 2006 to repudiate the Loan, instead allowing
Solomon to continue servicing the Loan on the basis of Solomon's
representations that he would take care of it, without any
further communication to the Bank, Joseph manifested an intent to
ratify the Loan.  See Thermo Contracting, 354 A.2d at 294-97
(holding that where general contractor knew of unauthorized

transactions by subcontractor, but did not take any action against either subcontractor or banks because the "continuing business relationship with [the subcontractor] was of sufficient value to [the general contractor] to cause it to forego the claim against him . . . while that satisfactory relationship continued," general contractor was barred from asserting six months later that the subcontractor lacked authority, on the basis that general contractor had ratified the subcontractor's actions). Just as in Thermo Contracting, "[t]he promise of restitution by the agent" – here, Solomon – "was acceptable to the principal until recovery seemed impossible." Id. at 297. In such a circumstance, we find no error in the Bankruptcy Court's determination that Joseph ratified the Loan.

### D.   Whether the Ratification Can Be Imputed to Terry

The Bankruptcy Court extended Joseph's ratification of the Loan to Terry on the basis that "Terry allowed her husband to act as her agent in financial matters." (6-1-10 Mem. Op. at 14.) The record supports this legal conclusion, and the Dweks even concede that "at best, Joseph can only be deemed to be an agent of Terry." (Dweks' Br. at 25.) Although Terry testified that she did not learn about the Loan until April 2006, when her husband told her about it, this was consistent with her statements that she was not involved in the financial aspects of her husband's life, and her husband handled her financial

20

affairs.  10-27-09 Trial Tr. at 27:15-22, 29:12-18.  The Dweks'
contention that Terry "would have had to independently ratify
Joseph's actions" therefore lacks merit.  (Dweks' Br. at 26.)  As
an example of Joseph acting on Terry's behalf, the Bank pointed
to an $18 million mortgage on the Property in favor of HSBC Bank
executed by Joseph in September 2005 by signing both his and
Terry's names.  10-27-09 Trial Tr. at 32:5-23.  We find that the
Bankruptcy Court did not err in finding that Joseph's
ratification of the Loan could be imputed to Terry.

###    E.    Whether the Dweks Failed to Prove the Bank was Negligent

The Dweks contended at trial that the Bank was negligent in
issuing the Loan by failing to verify the identity of the
borrowers and not demanding a written power of attorney with
respect to the documents executed by Solomon.  (Dweks' Br. at
26.)  The Bankruptcy Court determined that the Dweks failed to
carry their burden of establishing their negligence claim against
the Bank.  (6-1-10 Mem. Op. at 15.)  The Bankruptcy Court found
that the Dweks (1) failed to present evidence demonstrating the
standard of care in commercial lending owed to borrowers, and (2)
did not show that the Bank's alleged negligence was the proximate
cause of their damages, because "the cause of the Dweks' damages
was their failure to repudiate the loan when they became aware of
it."  (Id. at 16.)

To sustain a common law negligence claim, a plaintiff must prove (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.  Brunson v. Affinity Fed. Credit Union, 972 A.2d 1112, 1123 (N.J. 2009).  As to the duty owed by the Bank to the Dweks, we agree with the Bankruptcy Court's finding that the Dweks failed to establish the applicable standard of care in the commercial lending context.  While they argue now that the Bank's acceptance of the Loan documents and issuance of the Loan proceeds to Solomon "clearly violated commercial standards of banking and New Jersey law," they introduced no evidence at trial establishing what those standards were.  See Carozza v. Bank of Am., N.A., 2008 WL 4964001, at *3 (N.J. App. Div. Nov. 24, 2008) (stating that plaintiff's claim that bank's actions "did not comport with the reasonable standard of banking practice . . . would require the testimony of an expert"); cf. In re Lockwood Auto Grp., Inc., 428 B.R. 629, 637 (Bankr. W.D. Pa. 2010) (suggesting that expert testimony regarding "the question of what constitutes normal banking practice" is necessary to determine whether bank acted in good faith for purposes of defense to fraudulent transfer claim) (citing First Nat'l State Bank of N.J. v. Reliance Elec. Co., 668 F.2d 725, 730 (3d Cir. 1981)); Gennari v. Weichert Co. Realtors, 691 A.2d 350, 368 (N.J. 1997) (affirming trial court's dismissal of negligence claim due to plaintiffs' "failure to present expert

testimony to establish the standard of care in the real estate industry"). When the Dweks questioned witness Frank Leis, a vice-president at Sun responsible for the Work Out Department, about commercial lending practices at trial, the Bankruptcy Court sustained Sun's objection on the basis that Leis "testified he never worked on the lending side and didn't work on the lending side on this loan." 12-15-09 Trial Tr. at 68:12-69:3, 62:18-24.

To the extent the Dweks argue that the Revised Durable Power of Attorney Act, N.J.S.A. § 46:2B-8.9, provides a standard of care for holding the Bank negligent per se, this Court has already explained that the act is not a "banking regulation" but rather provides one mechanism for proving the existence of an agent-principal relationship to a third party. (Dweks' Br. at 28.) See supra at pp. 15-16.

Even if the Dweks had established the standard of care for the duty allegedly owed to the Dweks by the Bank, the Dweks' ratification of the Loan prevents them from proving the third element of their negligence claim: that the Bank proximately caused their damages. See Thermo Contracting, 354 A.2d at 295 (finding that ratification of allegedly unauthorized indorsements "would render the question of negligence academic," even assuming that Salsman v. Nat'l Cmty. Bank of Rutherford, 246 A.2d 162 (N.J. Law Div. 1968), cited by the Dweks here in support of their negligence claim, provided the applicable standard of care, and

23

therefore summarily dismissing negligence claim against banks).
(Dweks' Br. at 26.)  Notwithstanding the Bankruptcy Court's
finding that Joseph himself signed the Mortgage, assuming the
Dweks did not know about the Loan until March 2005, Joseph by his
own admission opted to allow Solomon to continue servicing the
Loan rather than timely repudiating the Loan to the Bank.  The
Dweks do not address this aspect of the Bankruptcy Court's ruling
in their briefs, and we find no basis for disturbing it.

Accordingly, we will affirm the Bankruptcy Court's dismissal
of the Dweks' negligence claim.

### F.   Whether the Bankruptcy Court's Findings Precluded the Dweks' Fraud in the Factum Defense

The Dweks essentially argue that the Bankruptcy Court erred
in failing to find that the Mortgage was void <u>ab initio</u> because
Joseph testified that "he never knowingly signed the Mortgage and
. . . did not intend to obtain a loan of $1.5 million," such that
the Mortgage was obtained by fraud in the factum.  (Dweks' Br. at
30-31.)  They point to the Mortgage document itself, noting that
(1) the signature page does not contain any reference to the Loan
or Note, such that it could have been signed in association with
some other transaction, and (2) whereas Joseph customarily places
a Hebrew symbol on the first page of business documents, the
Mortgage has the Hebrew symbol on the signature page, not the
first page.  (<u>Id.</u> at 32.)  Thus, they argue, even if the
signature on the Mortgage is genuinely Joseph's, "the facts

24

before the Court clearly demonstrate that it was obtained by
Solomon through fraud or trickery."  (Id. at 33.)

     Fraud in the factum "is a good defense to an action on a
negotiable instrument as against a holder in due course, provided
there has been no negligence on the part of the signer." N.J.
Mortg. & Inv. Co. v. Dorsey, 158 A.2d 712, 716 (N.J. App. Div.
1960), aff'd, 165 A.2d 297 (N.J. 1960) (holding that fraud in the
factum defense, as well as lack of negligence, must be proven by
the pleader by a preponderance of the evidence); accord
Bankcredit, Inc. v. Bethea, 168 A.2d 250, 254 (N.J. App. Div.
1961).  The law does not support the Dweks' assertion that a
signature obtained by fraud in the factum cannot in any
circumstance be enforced as subsequently ratified.  See Bluh, 656
A.2d at 859 (overruling trial court's finding that invalid
mortgage was void ab initio, determining that partners having a
majority interest in the encumbered property "had the capacity to
ratify the mortgage through their actions," and holding that
mortgage would be only voidable, not void ab initio, if the
"exacting standards" for ratification were met).  Because the
Bankruptcy Court carefully considered whether the Dweks had
ratified the Mortgage by failing to repudiate it, and determined
that they had, it did not err in "failing to address the Dweks
[sic] fraud defense to the Banks [sic] claim the Mortgage was
executed by Joseph and valid."  (Dweks' Br. at 29.)

We observe that circumstances typically present in decisions invalidating instruments as obtained by fraud in the factum and therefore void, such as the signatory's "subnormal mentality" or inability to read the document being signed due to either illiteracy or visual impairment, are not present in the record here.  See Amsterdam v. DePaul, 175 A.2d 219, 220-21 (N.J. App. Div. 1961).  Nor do the Dweks point to any evidence in the record tending to show that someone made false representations to Joseph to induce him to sign the Mortgage, such that he thought he was signing something else.  See id. (finding fraud in the factum where note's maker assured co-maker "that he was signing only a 'character reference' needed in connection with the purchase of merchandise from . . . the payee of the instrument").  We therefore find no error in the Bankruptcy Court's rejection of the Dweks' fraud in the factum defense.

CONCLUSION

The Court, for the reasons stated supra, concludes that the Dweks have failed to demonstrate that the Bankruptcy Court erred in entering the 6-10-10 Order of Final Judgment.  The Court will issue an appropriate order.

  s/ Mary L. Cooper<br>
**MARY L. COOPER**<br>
United States District Judge

Dated:    March 7, 2011